AO 91 (Rev. 12/93) Criminal Complaint ⓖ

## United States District Court

**REDACTED**

DISTRICT OF       DELAWARE

UNITED STATES OF AMERICA

v.

CHARANJIT "Tony" SINGH

█████████████████

**SEALED**

Criminal Complaint 08- 25 - M

**REDACTED**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about <u>November 19, 2007,</u> in <u>New Castle</u> County, in the District of <u>Delaware</u> defendant,

Charanjit Singh did knowingly receive, possess, sell, distribute, and purchase contraband cigarettes,

in violation of Title _____18_____ United States Code, Section(s) _2342_____.

I further state that I am a(n)_ Special Agent, ATF _ and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:     YES

_William J. Campbell_ (signature)
Signature of Complainant
William J. Campbell
Special Agent
ATF

Sworn to before me and subscribed in my presence,

_February 7, 2008_____        at __Wilmington, DE_____
Date                                      City and State

Honorable Leonard P. Stark
United States Magistrate Judge
Name & Title of Judicial Officer          _____
                                          Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AGAINST CHARANJIT SINGH

I, William J. Campbell, (hereinafter "Agent Campbell" or "your affiant") being duly sworn, depose and state that:

### Purpose of the Affidavit

This affidavit is made in support of an arrest warrant against Charanjit SINGH, DOB: █████████ (hereinafter "C.SINGH") of █████████████ e, Wilmington, Delaware 19810. Through this multi-year investigation, law enforcement officers have learned that C. SINGH with his wife, Sunit SINGH, DOB:█████████ SSN:█████████ (hereinafter "S. SINGH") is a co- owner of a Delaware corporations in the business of retail cigarette sales: Raj, Inc. t/a Ridge Tobacco, 315 Ridge Road, Claymont, Delaware 19703 (hereinafter the "Ridge Tobacco Store"). C. SINGH's son, Manjoth SINGH,█████ █████████ (hereinafter "M. SINGH") owns another cigarette retail outlet store, American Cigarette Outlet, Inc., 1401 North DuPont Highway, New Castle, Delaware 19720 (hereinafter "American Cigarette Outlet"). [1]

This investigation is being conducted by the ATF (Camden, New Jersey and Wilmington, Delaware Field Offices) with assistance from the New York State Alcohol Tobacco and Petroleum Bureau and the Delaware Division of Revenue. Your affiant has participated in this investigation and is personally familiar with the facts and circumstances of the offense described herein and/or has obtained the information provided from meetings and discussions with other law enforcement officers, civilians, or has learned the information provided from public records and/or subpoenaed documents. Your affiant is including within this affidavit sufficient information to support the issuance of a criminal complaint against C.SINGH for violation of 18 U.S.C. Section 2342. Your affiant is not detailing

---

[1]  C. and S. SINGH are identified as the owners and corporate officers of the Ridge Tobacco Store on its Delaware business license and registration paperwork. M. and S. SINGH are identified on Delaware license and registration paperwork as the owners and corporate officers of American Cigarette Outlet, which was incorporated in Delaware on February 5, 2007, and began doing business on June 9, 2007.

all of his knowledge about the target, the facts and circumstances under investigation, or the information revealed by this investigation.

**Affiant's Background**

Your affiant is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, ("ATF"), United States Department of Justice, and has been so employed since November, 1987.

Your Affiant is a graduate of the Criminal Investigators Training Program conducted at the Federal Law Enforcement Training Center and the ATF National Academy. Your affiant has attended several courses and seminars regarding alcohol and tobacco diversion, money laundering, complex investigations and advanced financial investigations.

During your affiant's employment with the ATF, your affiant has conducted narcotics, firearms, and arson for profit investigations that have involved large-scale conspiracies. By conducting these types of investigations, your affiant has obtained knowledge to recognize the methods used by cigarette and firearms traffickers and others disposed to commit criminal offenses to conceal their criminal activities from law enforcement personnel and others.

As a result of your affiant's training and experience, your affiant is familiar with federal criminal laws relating to contraband cigarette trafficking, conspiracy, and money laundering.  As a law enforcement officer, your affiant has participated in numerous arrests and search warrants for various violations of state and federal law.  In addition to this experience, your affiant has conducted investigations involving the illegal sale and diversion of cigarettes.

Based on your affiant's training, experience and participation in other financial investigations of illegal activities, especially those involving money laundering, illegal

2

cigarette/counterfeit stamp sales, and contraband cigarette trafficking, your affiant knows the following facts:

a. Individuals involved in illegal activities for profit often purchase and or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to conceal these assets from law enforcement or regulatory agencies.

b. Individuals can profit in contraband cigarette trafficking and/or the illegal sale or "diversion" of cigarettes by obtaining untaxed cigarettes and then illegally distributing them for a substantial profit. Individuals involved in these types of illegal cigarette activities for profit are required to conduct large financial transactions to purchase and sell the contraband cigarettes. Often times, the individuals or businesses involved in the sale of contraband cigarettes maintain numerous bank accounts in order that the funds generated can be deposited into the accounts by various means, electronically or in person.

c. It is common for individuals involved in the sale of cigarettes, whether legal or illegal, to maintain books, records, receipts, notes, ledgers, and other papers relating to the order, transportation, sale, and distribution of goods and materials, including the cigarettes themselves; that these aforementioned records and documents are often maintained where the individuals live or, in the case of a business entity, a location readily accessible to those individuals, in the case of a business operation, this is often on the business premises.

d. Individuals involved in illegal cigarette/stamp sales and/or contraband cigarette trafficking commonly maintain addresses and telephone numbers of their associates as well as photographs of themselves, their associates, and their assets. Such information and photographs are commonly maintained within the residences, businesses, vehicles, and/or other locations controlled by those engaged in the illegal cigarette sales and/or contraband cigarette trafficking.

e. Individuals involved in contraband cigarette trafficking generate various types of records and documents which are of a permanent nature, and which must be maintained to facilitate and continue their crime. This information (records of illegal transactions) typically must be readily accessible; therefore, such information is commonly maintained and retained within the residences, businesses, vehicles, and/or other locations under the control of the individuals involved in the illegal cigarette sales.

f. Individuals or businesses involved in contraband cigarette trafficking for profit often utilize electronic equipment, including computers, facsimile

machines, currency counting machines, telephone answering machines,
pagers, cellular telephones, PDAs and the like in their illicit trade. The
aforementioned equipment often stores information relative to the illegal
cigarette sales and is often maintained within the residences, businesses,
vehicles, and/or other locations controlled by those engaged in the illegal
cigarette/counterfeit stamp sales and/or contraband cigarette trafficking.

### Background: Core Concepts for Understanding Contraband Cigarette Trafficking

A "cigarette" is defined in 18 U.S.C. § 2341(1) as "(A) any roll of tobacco wrapped in
paper, or in any substance not containing tobacco; and (B) any roll of tobacco wrapped in
any substance containing tobacco which, because of its appearance, the type of tobacco
used in its filler, or its packaging and labeling, is likely to be offered to, or purchased by,
consumers as a cigarette." Domestic cigarettes are normally packaged in packs; each
pack usually contains twenty or twenty-five sticks of cigarettes. There are normally ten
packs of twenty cigarettes to a carton. A carton is the largest unit provided for retail sale.
Cartons are packaged either in half cases or "master" cases, known in the industry as
"6M" and "12M" cases, respectively. A 6M case contains 6,000 individual cigarette
sticks; a 12M case contains 12,000 individual cigarette sticks.

Your affiant knows that every state in the United States imposes some tax (within a wide
range) on the retail sale of cigarettes. The liability for these state taxes generally arises
once the cigarettes enter the jurisdiction of the state. Delaware, like all but two of these
states, requires indicia of the cigarette tax to be affixed on each individual unit (pack) of
cigarettes via a state tax stamp or imprint to demonstrate that the state tax has been paid.
Only cigarettes stamped with a Delaware tax stamp are permitted to be sold in Delaware
to retail customers; cigarettes bearing stamps from any other state are contraband. In
Delaware, your affiant is aware that certain out-of-state wholesale distributors are
licensed as the state's cigarette stamping agents. As such, they are generally responsible
for the payment of the state tax and for affixing the tax stamp on each individual pack of
cigarettes prior to delivery to retail dealers, such as the targets of this investigation. When
this investigation began, Delaware's cigarette tax was $0.55 per pack. On August 1,
2007, Delaware increased its cigarette tax to $1.15 a pack. Even with the increase in

4

price, Delaware's cigarette tax remains substantially lower than the tax levied on
cigarettes by the states of New Jersey or New York.

The term "contraband cigarettes" as defined in 18 U.S.C. § 2341(2), means "a quantity in
excess of 10,000 cigarettes which bear no evidence of the payment of applicable State or
local cigarette taxes in the State or locality where such cigarettes are found, if (as
everywhere except North Carolina, North Dakota, Native American reservations and
certain military installations) the State or local government requires [a tax stamp or
indicia of tax payment] to be placed on the packages or other containers of cigarettes to
evidence payment of cigarette taxes. . . ." Subject to narrow, specific exemptions, all
cigarettes possessed by anyone in Delaware other than a licensed Delaware stamping
agent must have Delaware tax stamp affixed to each pack of cigarettes in their
possession, thereby demonstrating that the state's or locality's cigarette tax has been
properly paid by the stamping agent.

Your affiant is aware that illegal interstate trafficking in untaxed cigarettes deprives the
states of millions of dollars in cigarette tax revenues. Recognizing that the range in state
cigarette taxes creates a potential for interstate trafficking in cigarettes to avoid (a higher)
state tax, the United States Congress enacted the Contraband Cigarette Trafficking Act,
Title 18, United States Code, Section 2341 *et seq.*, making it unlawful for any person,
other than an "exempt person," described below, to ship, transport, receive, possess, sell,
distribute, or purchase "contraband cigarettes" as previously defined.[2]

As described below, the cigarettes purchased by C. SINGH on or about November 19,
2007, did not have Delaware tax stamps on them. Moreover, your affiant has confirmed
that neither C. SINGH, nor his associated businesses, the Ridge Tobacco Store or
American Cigarette Outlet, have been a licensed cigarette stamping agent in Delaware

---

[2]  An exempt person is classified generally as a cigarette manufacturer, export warehouse
proprietor, customs bonded warehouse, common carrier, political subdivision, foreign
trade zone, and/or licensed distributor authorized to account for and to pay the state-
imposed tax and in compliance with all accounting and payment requirements.

5

during the period under investigation. Instead, C. SINGH (and related businesses) was
and is a retail distributor who can legally purchase stamped (taxed) cigarettes only from
certain wholesale distributors functioning as Delaware's stamping agents. As such, it is a
violation of federal and Delaware law[3] for C. SINGH or his associated businesses to be in
possession of untaxed (unstamped) cigarettes, as defined above.

### Investigation: 2004-2005

In approximately September 2004, as part of an investigation into contraband cigarettes
and counterfeit cigarette tax stamp trafficking in Delaware, Pennsylvania, New Jersey
and New York, your affiant learned that a confidential informant (hereinafter "CI-001")
had been identified by ATF Camden as knowledgeable in the distribution of untaxed
cigarettes. CI-001 reported that he/she had access to individuals in Delaware who were
selling counterfeit cigarette tax stamps and engaging in illegal cigarette trafficking. The
CI likewise informed the ATF that he/she had been selling up to 2,000 cartons per week
of what were believed to be stamped cigarettes to an individual known to the CI as "Raj,"
telephone number ███████████, who drove a black Toyota Highlander bearing
Delaware registration ███████ registered to Sunit K. SINGH (hereinafter the "Toyota
Highlander"). CI-001 described Raj as a male of Middle-Eastern descent, in his early 20s,
with a beard.

CI-001 related that Raj told him/her that Raj was involved in removing the Delaware tax
stamps from the cigarettes he was purchasing from CI-001 and replacing them with
counterfeit New Jersey cigarette tax stamps. Subsequent investigation identified Raj as
Manjoth SINGH, ███████████, Wilmington, Delaware 19810 ("M. SINGH").
The telephone subscriber information for telephone number ██████ then and
now comes back to Charanjit SINGH, ███████████ Wilmington, Delaware
19810 ("C. SINGH"). Subsequent investigation determined that C. SINGH was M.
SINGH's father. Telephone number ██████████ was already known to ATF Camden

---

[3] *See* Delaware Code, Title 30, Section 5242 (2007).

6

through subpoenaed telephone records as being a telephone number called by a target of an ATF contraband cigarette investigation.

In March 2005, while conducting surveillance of a Pennsylvania resident who was a target of an ATF contraband cigarette investigation, and who is hereinafter identified as CI-002, the target was seen parking his/her vehicle in the driveway of ████████████ ████ the SINGH residence, receiving what appeared to be three cases of cigarettes.

In August 2005, CI-001 contacted ATF Camden and advised that C. SINGH approached CI-001 and introduced himself as "Tony," Raj's father. CI-001 indicated that Tony asked if CI-001 could sell Tony as much SKOAL (smokeless tobacco) as the CI could supply. C. SINGH told CI-001 that he could sell SKOAL at his 7-11 store in New York. Tony provided CI-001 his cellular telephone number ████████. C. SINGH has used this telephone number throughout this investigation; it is subscribed to by his daughter, Mandeep SINGH, ████████████████████, Wilmington, Delaware 19810.

## Churning Authority – May 2006

On December 8, 2004, ATF was granted legal "churning authority" permitting the agency, with respect to any undercover investigative operation necessary for the detection and prosecution of crimes against the United States, do the following:

    (A) use appropriated sums to purchase property, buildings, and other facilities, and for leasing space, within the United States, the District of Columbia, and the territories and possession of the United States;

    (B) use appropriated sums to establish or to acquire proprietary corporations entities as part of an undercover investigative operation, and to operate such corporations or business entities on a commercial basis;

    (C) deposit appropriated sums and the proceeds from such undercover operation, in banks or other financial institutions, without regard to section 648 of Title 18 of the United States Code and section 3302 of Title 31 of the United States Code; and

(D) use proceeds from such undercover operation to offset necessary and reasonable
expenses incurred in such operation.

On May 10, 2006, Agent Campbell received authority to open up a churning account for
use in undercover operations in connection with this investigation. Accordingly, Agent
Campbell opened account number            with Commerce Bank (hereinafter the
"Commerce Bank Churning Account") on October 2, 2006.

### November 19, 2007

On October 19, 2007, C. SINGH called undercover New York State Investigator Rivera
with whom he had prior dealings and placed an order for 3,060 cartons of Newports,
explaining that he (SINGH) had lots of customers.

On November 8, 2007, Agent Campbell recorded a telephone call from Investigator
Rivera to C. SINGH, made in response to a call from SINGH to Rivera the day before.
This time, C. SINGH placed an order for 2,640 cartons of Parliaments and 1,800 cartons
of Capris; the negotiated price was $29.00 per carton. The potential purchase of USA
Gold brand cigarettes was also discussed.

On November 15, 2007, Agent Campbell wire transferred $31,679.56 to Philip Morris
and $74,174.46 to Lorillard from the Commerce Bank Churning Account to pay for the
untaxed cigarettes ordered by C.SINGH. On November 16, 2007, at approximately 1:30
a.m., Rivera telephoned C. SINGH and told him the cigarettes would be delivered
November 19, 2007, and that, accordingly, C. SINGH should have $217,500.00 available
in cash (7,500 cartons x $29.00 = $217,500.00), specifically requesting $100 bills if
possible. C. SINGH indicated he would try.

On November 19, 2007, Agent Campbell rented a delivery truck into which were loaded
2,640 cartons of unstamped Parliaments and 3,060 cartons of unstamped Newports for a
total of 5,700 cartons (for a total price of $165,300). Delivery of the Capris was delayed.
At approximately 2:45 p.m. that same day, Investigator Rivera called C. SINGH and
advised him that he was about 15 minutes away from meeting him at Tri-State Storage-

Hickman. Agent Campbell provided Rivera with recording and transmitting devices and, at about 3:30 p.m., Rivera moved the rental truck near the front gate of Tri-State Storage-Hickman to await C. SINGH's arrival. Shortly thereafter, C. SINGH arrived, driving the Toyota Highlander. After a few minutes, Rivera advised via the transmitter that C. SINGH was taking him to a different location.

At about 3:30 p.m., with ATF vehicles providing mobile surveillance, C. SINGH and Rivera traveled to Tri-State Self Storage, 1050 Ridge Road, Claymont, DE, 19703 (hereinafter "Tri-State Storage-Ridge Road"). Via the transmitter, Rivera advised that he was following C. SINGH into the storage facility to unit number 460.

Information from Tri-State Self Storage indicates that, as of January 8, 2008, Charanjit Singh, ▇▇▇▇▇▇▇▇▇▇ Wilmington, Delaware 19810 was the renter/occupant of unit number 460.

Via the transmitter, Rivera was heard unloading cases of the untaxed cigarettes, talking about the sale of contraband cigarettes, and counting currency until both men departed Tri-State Storage-Ridge Road at approximately 5:41 p.m. All the cigarettes provided to C. SINGH by Rivera were unloaded before Rivera left. ATF personnel, including Agent Campbell, followed Rivera back to a briefing location; no surveillance was maintained on C. SINGH after he left Tri-State Storage-Ridge Road. Agent Campbell retrieved the recording and transmitting devices from Investigator Rivera, as well as a Coors Light soft-side cooler bag containing $165,300.00 in cash representing C. SINGH's payment for the cigarette order. Thereafter, on November 20, 2007, Agent Campbell deposited this cash into the Commerce Bank Churning Account.

Among other things, Investigator Rivera confirmed that when he arrived at unit 460 for this deal, he saw what appeared to be 50-100 6M cases of USA Gold and Newport cigarettes already in the unit. C.SINGH claimed to Investigator Rivera that he (SINGH) sold approximately 90,000 cartons of USA Golds per week. SINGH further indicated his interest in obtaining USA Golds from Rivera, noting that, in addition to Rivera, he (SINGH) also obtains contraband cigarettes from a Spanish-speaking supplier named "Anna" with a good connection in North Carolina. C. SINGH explained that he would be

9

getting rid of some of the untaxed cigarettes the following morning, before he left with
his wife for Switzerland. Moreover, if Investigator Rivera was able to obtain the
additional requested cigarettes -- Capris that had not been delivered by Rivera -- by the
following day, Rivera was to call "Frank," (son M. SINGH) to do the deal.[4]  Investigator
Rivera also noted that he and C.SINGH used SINGH's money counting machine at this
meeting as they had previously. Some of the stacks of cash C. SINGH paid to Rivera for
the untaxed cigarettes were provided in money wrappers from Delaware National Bank's
Branmar Plaza branch in North Wilmington.

The day after this deal, November 20, 2007, ATF agents conducted mobile surveillance
of C. SINGH. At 9:00 a.m., agents saw SINGH leaving ▆▆▆▆▆▆▆▆▆▆▆ in the
Toyota Highlander, but then lost sight of him. At 9:15 a.m., other units found the Toyota
Highlander parked at the Ridge Tobacco Store. About 10 minutes later, C. SINGH was
seen leaving the Ridge Tobacco Store and driving to Tri-State Storage-Ridge Road.
Eventually, SINGH parked the car in the area of unit 460 and made the first of multiple
trips to a storage unit, returning to the car with cigarettes. On his initial trip, C. SINGH
was seen carrying what appeared to be five master cases from a storage unit; on each of
the subsequent trips he retrieved 3-4 cartons of cigarettes. All these cigarettes were
placed into the Toyota Highlander. At around 9:45 a.m., C. SINGH locked a storage
unit door and drove out of the facility to the nearby Ridge Tobacco Store where he
parked and went inside. About twenty minutes later, C. SINGH came out of the store,
removed all five cases and several single cartons of cigarettes from the Toyota
Highlander and entered the store with them.

**WHEREFORE,** based upon the information contained in this affidavit, your affiant
believes probable cause exists for the issuance of a criminal complaint and arrest warrant
for Charanjit SINGH who on or about November 19, 2007, knowingly shipped,

---

[4]  On November 20 and 23, 2007, Investigator Rivera received telephone calls from
"Frank," (M. SINGH) about the missing delivery of Capri cigarettes, because his father,
C. SINGH, was in Switzerland. Rivera made excuses for why the cigarettes could not be
delivered.

transported, received, possessed, sold, distributed, or purchased contraband cigarettes, in violation of 18 U.S.C. Section 2342.

William J. Campbell
Special Agent, ATF

Dated: February __7__, 2008

Sworn to and subscribed before me
this 7th February 2008

11